James H. Boomer, J.
Upon the trial of this action to enjoin the defendants from renting their properties without first obtaining a permit to operate a migrant labor camp, the facts have been stipulated as follows:
1. During August and September, 1971 defendant Morris Espenscheid was the owner of a parcel of real property located on Route 104, Town of Huron, Wayne County, and known as Espenscheid No. 1 East.
2. During August and September, 1971 defendant Evelyn Goodman leased a portion of the real property known as Espenscheid No. 1 East from defendant Morris Espenscheid.
3. The real property rented by defendant Evelyn Goodman was improved with a building which contained a kitchen and a bedroom. Evelyn Goodman operated a restaurant in this building.
4. This building contained a bedroom which defendant Evelyn Goodman rented to an individual from the middle of August, 1971 until the last week of September, 1971.
*206 5. During this same period of time, defendant Morris Espenscheid rented the remainder of his property to four other men who used the property as living quarters.
6. During the months of August and September, 1971 the occupants of the living quarters were Robert Gathers, Edward Singleton, Sam Stanton, David Knolden (also known as David Nolan) and Major Lee McCaskill. Mr. Stanton rented a room from Evelyn Goodman and the other four individuals rented their living quarters from Morris Espenscheid.
7. When renting rooms for living quarters, neither defendant made any agreement with the tenants with regard to length of stay. Defendant Espenscheid will also rent living quarters to anyone at any time of the year and does not confine his activities to the growing season in Wayne County.
8. Robert Gathers, Edward Singleton, David Knolden (also known as David Nolan) and Major Lee McCaskill were employed as laborers in farm activities by D. W. Van Deusen, a grower located in the Town of Huron, Wayne County, during the times mentioned herein.
9. Neither defendant operates a farm and none of the residents of the Espenscheid property were employed by defendants. Defendants rented living quarters to anyone expressing a desire to rent, without regard to the employment of the prospective tenant.
10. On August 19, 1971, both defendants were served with ‘ Notice to Discontinue Violations ’ ’ in accordance with section 1330 of the Public Health Law.
11. "Neither defendant has applied for nor secured a permit to operate a migrant labor camp as set forth in 10 NYCRR 15.20(a).
12. Both defendants rented unheated, unfurnished living quarters to individuals. The tenants supplied their own utilities and all tenants shared water and toilet facilities located on the property.
The key issue is whether the defendants, during the summer of 1971, were operating a “ migrant labor camp ” as defined in subdivision (c) of section 15.1 of the State Sanitary Code (10 NYCRR 15.1 [c]). That subdivision reads: “Migrant labor camp shall mean a property consisting of a tract of land and all vehicles, mobile homes, buildings or other structures pertaining thereto, any part of which may be used or occupied by persons employed as laborers in farm activities including sleeping facilities, provided in whole or in part, by the employer of such persons, owner, lessee, or operator thereof, with or without stipulated agreement as to the duration of their stay, whether *207 or not they are supplied with meals but who are supplied with ■such services or facilities as are necessary for their use of such property. The terms farm labor camp and migrant labor camp shall have the same meaning. ”
I hold that the defendants were not operating a migrant labor camp as defined in the State Sanitary Code, since the occupants of the properties were not ‘ supplied with such services or facilities as are necessary for their use of [the] property. ” As stipulated, defendants rented unheated, unfurnished living quarters to individuals and the tenants supplied their own utilities. Presumably, the tenants provided their own furniture and made their own arrangements with the gas and electric company for the supply of utilities. The dictionary definition of the word ‘ ‘ facility ” is, “ the means by which something can be more easily done; conveniences ” (Webster’s New International Dictionary of the English Language, 2d ed.). Used in this broad sense, utilities are facilities, if not services. And that term as used in the Sanitary Code is sufficient to encompass furniture, for paragraph (3) of subdivision (c) of section 15.6 of the code (10 NYCRR 15.6 [c] [3]) refers to beds, cots, bunks, springs and mattresses as ‘ ‘ facilties ’ ’.
Since the facilities of furniture and utilities are necessary for the use by the tenants of the defendants’ property and they are not supplied to the tenants, the defendants ’ property cannot be catagorized as a migrant labor camp. This interpretation does not conflict with the purpose and intent of the provisions of the code regulating migrant labor camps. The occupants of those camps, due to their itinerant nature, do not usually provide their own furniture, nor are they generally in a position to make arrangements for their own utilities. The operators of a migrant labor camp must of necessity supply furniture and utilities to the occupants of the camp.
Should the Public Heath Council determine that farm laborers who rent unfurnished and unheated accommodations and provide their own utilities need the protection given to occupants of migrant labor camps, it may amend the definition of migrant labor camps to bring such accommodations within its scope.